**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CATHY MICHENER,<br><br>              Plaintiff,<br><br>     v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, VERIZON LONG-TERM DISABILITY PLAN FOR MID-ATLANTIC ASSOCIATES, and THE VERIZON EMPLOYEE BENEFITS COMMITTEE,<br><br>              Defendants. | Civil Action No. |

## COMPLAINT

### I. PARTIES

1.      Cathy Michener is an adult citizen of the United States and resides in this District in Westmoreland County, Pennsylvania.

2.      Defendant Metropolitan Life Insurance Company ("MetLife") is a corporation with a principal place of business at Metropolitan Life Insurance Company, 200 Park Avenue, New York, NY 10166-0188.  MetLife administers claims and appeals under the Plan, and it used the following address for these purposes:  P.O. Box 14590.

3.      Defendant Verizon Long-Term Disability Plan for Mid-Atlantic Associates (the "Plan") is an "employee benefit plan" and an "employee welfare benefit plan" within the meaning of ERISA §§ 3(1), 3(3), 29 U.S.C. § 1002(1) and (3), with an address for the service of process at Verizon Legal Department, Employee Benefits Group, One Verizon Way, Basking Ridge, NJ  07920.  It is sued as a party responsible for providing the benefits and as a party

needed for just adjudication under Rule 19 of the Federal Rules of Civil Procedure, as

Ms. Michener seeks promised long-term disability benefits under the terms of the Plan.

4.     The Verizon Employee Benefits Committee ("VEBC")  is the Plan Administrator

of the Plan in this case and is located c/o Verizon Benefits Center, 100 Half Day Road, P.O. Box

1457, Lincolnshire, IL  60069-1457.

## II.  JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 29 U.S.C. § 1132(e) and (f) and 28 U.S.C.

§ 1331.

6.     Venue over this action lies in this Court pursuant to 29 U.S.C. § 1132(e)(2).

## III.  FACTUAL AVERMENTS

7.     Ms. Michener was actively employed by Verizon as a Consultant from May 31,

2007 through January 4, 2012.

8.     As a Consultant, Ms. Michener was required to:

Contribute to Verizon's revenue results by selling Verizon broadband,
entertainment & telecommunications products and services.  Attain or exceed a
monthly sales objective.  Additional functions may include, investigating and
resolving customer inquiries, disputes and/or complaints on service, billing, rates,
adjustments, and policy issues.  Calling customers to negotiate collection of
overdue bills and advising customers of service interruption for non-payment of
bills.

9.     Ms. Michener's job duties as a Consultant also included:  responding to requests

from customers regarding Verizon products, verifying service orders, establishing and assessing

customer credit information, interacting with other Verizon departments, operating a computer

with multiple systems and applications, meeting or exceeding corporate sales objectives, meeting

or exceeding corporate requirements of cash flow and risk management, achieving dollars

recovered results, and collecting delinquent bills.

10. As a Verizon employee, Ms. Michener was a participant in the Verizon Sickness and Accident Disability Benefits Plan for Mid-Atlantic Associates (hereinafter referred to as the "STD Plan") as well as the Verizon Long-Term Disability Plan for Mid-Atlantic Associates (the "Plan").

11. The STD Plan provided disability benefits for up to fifty-two (52) weeks, so long as the participant is certified as disabled by the claims administrator.

12. If a participant remains disabled after receiving fifty-two (52) weeks of STD benefits, he or she may be eligible to receive long-term disability ("LTD") benefits under the Plan. Participants may apply for LTD benefits prior to the expiration of the fifty-two (52) week waiting period.

13. The LTD benefits provide income equal to fifty percent (50%) of monthly base pay, reduced by Social Security disability insurance benefits.

14. To be eligible for the LTD benefits the employee must meet one of the following two conditions as follows:

- The employee must be unable to work in any occupation or employment for which he or she is qualified or may become reasonably qualified by training, education, or experience; and

- As a result of the disability, the employee is only able to work at a job that pays less than half of his or her basic rate at the time he or she became disabled.

15. LTD benefits are reduced by Social Security disability benefits and old-age benefits and continue until a participant is no longer disabled, or until death.

16. A Plan participant who is receiving LTD benefits is also entitled to receive continuing medical coverage, survivor benefit coverage, a final distribution of the participant's Company-sponsored Savings Plan, and a service or disability pension.

17.     In January 2012, Ms. Michener applied for benefits under the STD Plan based on a diagnosis provided by Alvaro N. Changco, M.D., her primary care provider, of Anxiety, Panic Attack and Depression.  Dr. Changco noted that she had significant loss of psychological, physiological, persona and social adjustment (severe limitations).

18.     Ms. Michener was deemed disabled as of January 5, 2012 and approved by MetLife for benefits as of January 16, 2012 under the STD Plan.  In support of her application for benefits under the STD Plan, Ms. Michener relied primarily on the records of Dr. Changco, who was managing her medications.

19.     In October 2012, Dr. Changco referred Ms. Michener to a psychiatrist, Jeanann McCallister, M.D., who also submitted her records.  Dr. McAllister diagnosed Ms. Michener with "major depressive disorder severe," noting pathologic grief, and a global assessment of functioning (GAF) of 41-50, which represents serious symptoms or any serious impairment in social, occupational, or school functioning.

20.     In addition to her psychological issues, Dr. McAllister noted on November 2, 2012 that Ms. Michener had a new onset of hemorrhagic menorrhea, managed by her gynecologist.

21.     In an office visit note dated November 30, 2012, Dr. McAllister noted that Ms. Michener was scheduled for a hysterectomy on December 6, 2012, and would require a four week recovery period.

22.     The administrator of the STD Plan had Ms. Michener undergo three independent medical exams ("IMEs").

23.     The IME report dated March, 15 2012, by Guillermo Borrero, M.D., a board certified psychiatrist and medical director, behavioral health, at Jefferson Regional Medical

Center, noted that Ms. Michener began to exhibit severe anxiety and depression when her father

died in April 2011 and her son, who was in the Army, was assigned to a tour of Afghanistan, and

those conditions were exacerbated by a confrontation with her supervisor at work. Like her

treating psychiatrist, Dr. Borrero diagnosed Ms. Michener with Major Depressive Disorder,

Panic Disorder with Agoraphobia and Anticipatory Anxiety, noted her history of hypertension

and gastroesophageal reflux disease, or "GERD," and assessed a GAF of 40. He opined that Ms.

Michener is "incapable of handling stress" and agreed with her treating providers that she is

totally disabled from performing any work, including but not limited to her current job.

24.     The IME report dated June 10, 2012 by Ralph Gardener, M.D., a board certified

psychiatrist, similarly noted that her symptoms were triggered by the loss of her father, her son's

deployment and being "picked on" at work by her supervisors. Dr. Gardner also diagnosed Ms.

Michener with Major Depressive Disorder, noted her history of high blood pressure, assigned a

GAF of 55, and agreed with her treating provider's recommendation that Ms. Michener is totally

disabled from performing any work, including but not limited to her current job, by virtue of her

continuing major depressive disorder.

25.     The IME report dated September 21, 2012 by Lawrence T. Lobl, M.D., noted that

Ms. Michener felt that she was improving and expressed the wish to return to work in a less

stressful position. Nonetheless, he opined to a high degree of medical certainty that Ms.

Michener's recovery was "fragile and that she continues to be totally disabled from work and

that an attempt to pressure her to return to work at this time may worsen her condition." He

concluded that:

> Ms. Michener has suffered from Post Traumatic Stress Disorder which
> was reactivated by the loss of her father and by the confrontation with her
> supervisor, which led to a disabling depression accompanied by anxiety.

> Ms. Michener is in a phase of recovery now, but this is fragile. I believe
> that she continues to be totally disabled from work. …

Like Dr. Borrero and Dr. Gardner, Dr. Lobl agreed with the treating provider's recommendation that Ms. Michener "is totally disabled from performing any work, including, but not limited to [her] current job."

26.    Based on the foregoing information, Ms. Michener was certified as disabled and her STD benefits were approved for the entire fifty-two (52) week period, until January 13, 2013.

27.    In November 2012, MetLife advised Ms. Michener that she could apply for LTD benefits under the Plan if her disability should extend beyond her STD disability expiration date, and forwarded to her the necessary forms.

28.    Ms. Michener applied for LTD benefits, stating that she was prevented from performing the duties of her job due to panic/anxiety attacks, confusion, crying, fear and PTSD, and noting her difficulty doing anything "that requires concentration or memory." She found it difficult to do household chores and even get out of bed each day.

29.    In support of her claim for LTD benefits, Dr. McAllister completed an Attending Physician Statement in November, 2012. Regarding Psychological Function, Dr. McAllister checked "Class 5 – Patient has significant loss of psychological, physiological, personal and social adjustment (severe limitations)," remarking, "very depressed, physical imitations + stress ongoing." For her prognosis, Dr. McAllister noted that for Ms. Michener to return to work, her "[d]epression must improve." She noted that Ms. Michener's surgery (hysterectomy) for hemorrhagic menorrhea was scheduled for December 6, 2012, and diagnosed a GAF score of 45. Dr. McAllister noted Ms. Michener's "[e]xtreme inability to function in most areas due to continuous impairment." On a behavioral health initial functional assessment form, Dr. McAllister assigned Ms. Michener a "0" on a 0 - 4 point scale for measuring the patient's ability

to maintain appropriate control of emotions, handle goals, objectives and performance measurements, maintain a work pace appropriate to workload, interact with customers, accept and carry out responsibility for direction, control and planning of tasks, and to supervise or manage others.  She assigned Ms. Michener a "1" as to her ability to comprehend and follow instructions, perform simple and repetitive tasks, respond appropriately to supervision, generalize, evaluate and make independent decisions and perform intellectually complex tasks. Dr. McAllister assigned no score above "2."

30.    Dr. McAllister's contemporaneous office visit notes were consistent with her responses on the Attending Physician's Statement.

31.    Dr. McAllister continued to follow up with Ms. Michener after her hysterectomy, following which, in January 2013, she was hospitalized for costochondritis and pleurisy.

32.    In connection with her application for long term disability, yet another IME was performed by Paul M. Bernstein, Ph.D.  In a report dated January 23, 2013, Dr. Bernstein, after conducting a battery of neuropsychological exams, agreed with Ms. Michener's treating provider's recommendation that she is totally disabled from performing any work, including but not limited to her current job.  In his report, Dr. Bernstein noted Ms. Michener's complaints of fatigue, inability to concentrate, difficulty in thinking logically and significant memory loss.  He concluded within a reasonable degree of psychological certainty that Ms. Michener is suffering from a Major Depressive Disorder with Anxiety.  With respect to her limitations, Dr. Bernstein opined that her major depressive disorder and anxiety disorder "manifest in her inability to effectively listen, remember, and respond to others at a professional level."  In particular, he found Ms. Michener's scores for visual memory, immediate memory and delayed memory to be significantly impaired, and delayed memory for oral and visual information to be defective.

33.    Based on the foregoing, in a letter dated February 14, 2013, MetLife approved Ms. Michener's LTD benefits under the Plan.

34.    The February 14, 2013 letter, along with a letter dated February 13, 2013, informed Ms. Michener that Social Security Disability benefits ("SSDI") will cause a reduction in her LTD benefits, and required that, if her Social Security application is denied, she "must reapply and provide us with verification of your new application," and referred her to the Advocator Group to assist her with her application.

35.    In a letter dated April 12, 2013, MetLife confirmed that Ms. Michener was approved for SSDI and notified her that it was reducing her monthly benefit by the amount of her SSDI and that future benefits would be withheld until her full reimbursement for any overpayment was received.

36.    Throughout 2013, MetLife continued to request updated records from Dr. Changco, Dr. McAllister and Kelley McGinnis, a therapist who had seen Ms. Michener from time to time, all of whom confirmed her severe ongoing anxiety and depression.

37.    On or about September 9, 2013, Ms. Michener tore her left meniscus and began to wear a knee brace.

38.    In September 2013, Dr. McAllister noted  new diagnoses of sleep apnea and dislocation of Ms. Michener's left knee, with which she could not ambulate without pain.

39.    Although Ms. Michener was compliant with treatment, in a July 2014 office visit note, Dr. McAllister saw Ms. Michener emergently and observed that she was still very tired and that her quality of life was "slipping."

40.    Based on the foregoing, MetLife continued to authorize payment of LTD benefits to Ms. Michener under the Plan.

41.     Although her medical condition had not improved sufficiently for Ms. Michener to return to work, in a letter dated January 21, 2015, MetLife claimed that "based on the lack of current medical documentation received and the terms of your employer's Long Term Disability Plan," it was unable to approve benefits beyond January 20, 2015.  The letter advised Ms. Michener that for claim reconsideration, she could submit, *inter alia*, evidence of all recent and current examination findings, office notes, test/lab reports, therapy notes and medical records from all health care providers.

42.     In response, Ms. Michener submitted a February, 2015 office visit note from Dr. McAllister reporting ongoing fatigue, memory loss, anxiety, depression, difficulty sleeping, mood swings, panic attacks.  Thereafter, LTD benefits were continued for another month.

43.     Nonetheless, in a letter dated May 13, 2015, MetLife notified Ms. Michener that benefits were terminated as of February 28, 2015, "due to insufficient updated medical information on file to assess your current functionality."  According to the letter, the decision to terminate benefits was based on an opinion by a so-called Independent Physician Consultant ("IPC") and a Psychiatric Clinical Specialist ("PCS"), neither of whom examined Ms. Michener, unlike Dr. Borrero, Dr. Gardner, Dr. Lobl and Dr. Bernstein.

44.     According to a report dated April 17, 2015, the IPC, Lawrence B. Erlich, M.D., reviewed Ms. Michener's available medical records and concluded, based on a report of a single recent incident of drinking, that Ms. Michener has a substance use disorder, making it impossible for him to determine whether she a psychiatric disorder and that she is not receiving appropriate care and treatment.

45.     In response to a copy of the IPC's report, Dr. McAllister faxed an office visit note dated March 26, 2015, finding **upon examination** that "Cathy remains seriously depressed, not

suicidal but no interest in any activity all day every day, now sleeping 12 or more hours every day." She further noted that Ms. Michener had "[choppy speech] through tears. She is not getting better and depression is certainly worse." This note references her emergency gallbladder surgery, which appeared to resolve. Dr. McAllister did not make any findings regarding substance abuse based on her examination. Ms. Michener was referred to a therapist.

46.    Despite the reference in the May 13, 2015 letter to a review of Ms. Michener's claim by the PCS, there is no report of the PCS in Ms. Michener's claim file.

47.    The May 13, 2015 letter adopts the IPC's conclusion that Ms. McAllister has a substance abuse disorder (which as noted in paragraph 44 is based on a single report), and fails to consider whether her depression continues to disable her within the meaning of the Plan.

48.    The May 13, 2015 letter mentions Ms. Michener's receipt of SSDI, but otherwise does not consider the basis for the award of benefits by Social Security, merely stating that that determination is governed by different standards than MetLife's review.

49.    The May 13, 2015 letter advised Ms. Michener of a right to appeal and generally advised her to provide any additional comments, documents, records or other information relating to her claim, but failed to inform her of the information needed to perfect her claim.

50.    Ms. Michener requested an appeal review of the termination of benefits, which MetLife received on June 1, 2015.

51.    Medical records already in the claim file and the notes of a "claimant call" by a MetLife representative to Ms. Michener, were reviewed by Dr. Marcus Goldman, a non-treating physician who did not conduct an in-person exam, and who is a "go-to" paper review psychiatrist for insurance companies and third party claim administrators, because he reliably renders opinions supporting the termination of disability claims.

52.     Dr. Goldman's report dated June 24, 2015 summarily concluded that the medical information does not support functional limitations as of March 1, 2015, without referencing any information to show that Ms. Michener's condition had improved since MetLife first approved benefits in January 2013.  Further, like the IPC, Dr. Erlich, Dr. Goldman summarily concludes that Ms. Michener's alcohol use issues have largely gone untreated, but fails to consider whether her depression continues to disable her within the meaning of the Plan.  He also states that the last progress note was approximately three months old, but did not request updated records.

53.     Despite the fact that the conditions for which Ms. Michener was initially approved for benefits never improved, in a letter dated July 20, 2015, MetLife upheld the termination of her LTD benefits, stating that "the medical information provided did not support psychiatric functional limitations that would have precluded you from performing any occupation or inability to work at a job that pays less than half of your basic pay rate as of February 28, 2015."

54.     The letter is based on the report of Dr. Goldman, and does not reference any medical information that shows that Ms. Michener's condition had improved since the last payment of LTD benefits under the Plan.

55.     The July 20, 2015 letter mentions Ms. Michener's receipt of SSDI, but otherwise does not consider the basis for the award of benefits by Social Security, instead merely stating that that determination is governed by different standards than MetLife's review.

56.     The July 20, 2015 letter advised Ms. Michener that she could file a voluntary second and final level appeal, but other than informing her she could submit "additional relevant documentation that you believe will substantiate your claim," the letter failed to inform Ms. Michener of what information was actually needed to perfect her claim.

57.     After receipt of the July 20, 2015 letter, Ms. Michener requested a copy of her claim file.

58.     On or about August 3, 2015, she received a package of documents (including what appear to be original documents, rather than photocopies or scans) relating to numerous other claimants, but nothing concerning her claim.  She followed up with a telephone call to MetLife, and was told that her claim file was sent out, but it remains unknown where that file was sent and whether her privacy rights were violated.

59.     On or about August 13, 2015, Ms. Michener received her claim file.

60.     Under cover of letter dated October 16, 2015, Ms. Michener submitted her voluntary second level appeal ("Second Appeal"), through counsel, which noted that Ms. Michener was never provided, pursuant to 29 C.F.R. § 2560.503-1(g), "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary."

61.     The October 16, 2015 letter also noted that despite repeated requests, Ms. Michener did not receive a copy of the Plan until October 1, 2015.

62.     The Second Appeal included, in addition to records already in the claim file, the following:

- An office visit note dated April 7, 2015 by Anne Murphy, Ph.D., Ms. Michener's therapist, who notes ongoing sleep issues and knee problems, describes the relationship between mental and physical health and discusses strategies for decreasing symptoms of depression.

- A progress note dated June 25, 2015 by Dr. Murphy, who confirmed a worsening of Ms. Michener's condition since the onset of her disability claim and noted that "Ms. Michener's symptoms of depression may be worse now as compared to when we last met."

- An office visit note dated July 28, 2015 by Dr. McAllister observing that despite Ms. Michener's application of recommended strategies, "Cathy is not improved, in fact

feeling more down and depressed.… She reports no motivation, sleeping probably more than 12 hours in 24. Daily tearfulness. Sleep is of poor quality at night."

- A progress note dated August 25, 2015 by Dr. Murphy, who indicates that Ms. Michener is suffering gastrointestinal distress which is likely anxiety-related. She also notes that despite recommending strategies to improve Ms. Michener's anxiety, which Ms. Michener understood and tried to follow, subsequent events added to Ms. Michener's stress level, making it even more difficult for her to overcome her debilitating anxiety and depression.

- An office visit note dated September 10, 2015 by Dr. McAllister which shows ***worsening of her condition*** since the onset of Ms. Michener's disability. On general examination:

    > Cathy continues [t]o be depressed and anxious.… She walks unassisted but with special tape and has a limp. She has poor attention span and continues to be with very low tolerance for frustration … exacerbated by lack of quality of sleep architecture.

    The office visit note dated September 10, 2015 lowers Ms. Michener's GAF to 40.

- Records of Ms. Michener's gynecologist showing complications following her hysterectomy.

63.    On October 23, 2015, Ms. Michener submitted additional records of Dr. Edward Snell, an orthopedic specialist treating Ms. Michener for pain from osteoarthritis in her left knee which impeded her ability to exercise regularly and overcome her depression.

64.    On the same date, Ms. Michener submitted additional records of Dr. Changco, which included radiological reports, suggestive of interstitial pulmonary edema, and a March 7, 2015 operative report of her cholecystectomy, which likely caused the anxiety-related gastrointestinal distress discussed in her therapist's notes.

65.    Dr. Changco's records also included a June 2013 polysomnography report, which confirmed Ms. Michener's diagnosis of sleep apnea, and described ongoing diagnosis of and treatment for her sleep apnea.

66.     In connection with the second appeal, MetLife provided to two new IPCs Ms. Michener's claim, including not only her medical records, but also the reports of the MetLife's other records reviewers, MetLife's claim notes and MetLife's correspondence letters.

67.     According to his report dated November 15, 2016, one IPC, Richard E. Jackson, M.D., a psychiatrist, purports to evaluate whether Ms. Michener's major depressive disorder and anxiety limit her functionality.  Dr. Jackson does not consider whether it is appropriate for a non-treating psychiatrist to evaluate a patient based purely on a review of the patient's records, including non-medical records, without ever interviewing the patient.  In support of his conclusion that "the available medical information does not convincingly support presence of an impairing psychiatric disorder, as of 3/01/2015," he observes that Ms. Michener does not exhibit signs of "suicidal or homicidal ideation …"; this observation is irrelevant, since it is not necessary for a patient to have "suicidal or homicidal ideation" or a "severe psychiatric condition" in order to be unable to engage in regular, gainful employment.  Dr. Jackson does not consider whether Ms. Michener's co-morbid physical and mental conditions combined to result in disability.

68.     Ms. Michener's claim file was also reviewed by IPC, Kevin Trangle, M.D., M.B.A.  In a report dated November 12, 2015, Dr. Trangle, like Dr. Jackson, fails to consider the interrelationship between Ms. Michener's co-morbid physical conditions, particularly her sleep apnea, and her major depressive disorder and anxiety.  His report does not consider whether her major depressive disorder and anxiety, the major cause of her disability, prevent her from engaging in substantial gainful activity.  Dr. Trangle is in no position to make that assessment, insofar as he did not examine Ms. Michener, and it is not appropriate for a non-treating physician to evaluate a patient's mental health condition without ever interviewing the patient.

69.    In response to these reports, Ms. Michener submitted her November 2015

progress notes from her behavioral health providers.  She included:

- A November 10, 2015 progress note by Dr. Murphy, which shows ongoing
  depression and anxiety, an assessment unchanged from reports earlier in the year, and
  confirms that Ms. Michener "is experiencing episodes of anxiety that seem to come
  out of the blue."

- Dr. McAllister's November 17, 2015 office visit note which similarly reports
  conditions that remain unchanged or worsened from the onset of the disability.  Dr.
  McAllister notes that Ms. Michener is exhibiting symptoms of paranoia, severe
  anxiety, severe depressed mood, difficulty falling asleep and waking frequently,
  mood swings, panic attacks, stressors and suicidal thoughts.  Her General
  Examination shows that:

  > Cathy is decompensating.  She is tearful throughout the session.  She
  > seems to not be able to accomplish anything; was in grocery stores and
  > had panic attack ….  She is increasingly despondent, and anxious.  She
  > had fleeting thoughts of being dead, new for her, since last visit.  …

  > [She is i]ncreasingly dysfunctional.

70.    In an addendum dated January 10, 2016, Dr. Jackson reported his review of the

foregoing records along with the report of Dr. Trangle, the other non-examining IPC.  Dr.

Jackson concluded that the additional information did not change his previous responses,

indicating that the "observed findings" of Ms. Michener's mental health treating providers did

not provide any "new information pertaining to Ms. Michener's condition or functional abilities

as of the date under consideration, 3/01/2015," ignoring the fact that Dr. McAllister's November

17, 2015 office visit note did suggest signs of suicidal ideation, which Dr. Jackson had

previously suggested would support a finding of disability in his November 15, 2016 report.

71.    Despite the fact that Ms. Michener's medical records showed no improvement in

the conditions for which MetLife considered her to be disabled for two years and there was no

change in the definition of disability, in a letter dated January 14, 2016, it upheld the termination

of her claim.

72.     The January 14, 2016 letter relies on the reports of the two IPCs discussed above.

73.     Like MetLife's initial determination and appeal determination, the January 14, 2016 letter mentions Ms. Michener's receipt of SSDI, but otherwise does not consider the basis for the award of benefits by Social Security, merely stating that that determination is governed by different standards than MetLife's review.

74.     On June 17, 2016, Ms. Michener submitted to MetLife a report by Dr. Changco, her primary care physician, and requested that the record be reopened to consider the report.

75.     Dr. Changco's report confirmed that he oversaw Ms. Michener's care in 2011 to 2012 when his patient began exhibiting signs of major depressive disorder, anxiety and severe stress, and referred her to Dr. McAllister when her symptoms did not remit.  He further confirmed that a Carroll scale administered prior to a polysomnography on June 19, 2013 confirmed her depression diagnosis, and opined that her obstructive sleep apnea is related to her major depressive disorder.  Dr. Changco, after review of Dr. Trangle's and Dr. Jackson's reports, confirmed that those reports failed to consider the interrelationship between Ms. Michener's obstructive sleep apnea and her major depressive disorder and anxiety and that it is not appropriate for a non-treating psychiatrist to evaluate a patient purely on a review of the patient's records (including non-medical records) without ever interviewing the patient.  Dr. Changco opines that Dr. Jackson's observation that Ms. Michener does not exhibit signs of suicidal or homicidal ideation is irrelevant, since it is not necessary for a patient to have a severe psychiatric condition in order to be unable to engage in regular, gainful employment. Dr. Changco opines, to a reasonable degree of medical certainty, that Ms. Michener's major depressive and anxiety disorders are ongoing since 2012 and prevent her from working in any employment for which she is qualified or could become qualified by training, education or experience.

16

76.     In an addendum dated July 29, 2016, Dr. Trangle reviewed the report of Dr. Changco to determine if it changed his previous opinion.  Dr. Trangle confirmed that he did not render an opinion regarding Ms. Michener's mental health conditions.  However, he discussed a study which ***confirmed*** that clinically significant depressive symptoms increase progressively and independently with sleep apnea severity, but did not address whether the interrelationship of Ms. Michener's obstructive sleep apnea and her major depressive disorder and anxiety were disabling.

77.     In an addendum dated August 1, 2016, Dr. Jackson reviewed the report of Dr. Changco to determine if it changed his previous opinion.  The addendum is not restricted to a review of medical records but also notes the history of the claim.  Like Dr. Trangle, Dr. Jackson confirms studies that depressive disorders may be aggravated by obstructive sleep apnea.  He also agrees with Dr. Changco's statement that the absence of suicidal or homicidal ideation does not indicate that he claimant is able to engage in regular gainful employment.  Nonetheless, Dr. Jackson concludes that the report does not provide any further support for presence of a debilitating psychiatric disorder, which would restrict or limit the claimant's occupational functioning as of March 1, 2015, or beyond.

78.     Notwithstanding that Ms. Michener's medical records showed that her disabling Major Depressive Disorder and Anxiety, confirmed by four IMEs, had worsened, and not improved since MetLife first approved benefits under the Plan, in a letter dated August 3, 2016, MetLife advised that the report of Dr. Changco did not change the recommendations of the IPCs, who never examined Ms. Michener.

79.     At no time throughout the claim process did MetLife consider or determine whether there were jobs in which Ms. Michener was able to engage that paid more than half of her basic pay rate.

80.     Significantly, the February 20, 2012 letter did not address co-morbid diagnoses, and it acknowledged the award of SSDI, but did not otherwise consider the Social Security's determination.

81.     MetLife and the VEBC are "fiduciaries" within the meaning of 29 U.S.C. §§ 1002(21) and 1102 in that they exercised discretionary authority or discretionary control respecting management of the Plan and/or exercised authority and control respecting management or disposition of its assets and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

82.     Defendants breached their fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, in failing to act for the exclusive benefit of Ms. Michener, in failing to act in accordance with the Plan and in making their decision in the absence of all relevant information, and in otherwise failing to provide a full and fair review of the decision to deny benefits.

83.     Ms. Michener has exhausted all administrative levels of appeal.

## IV.    CLAIMS

### COUNT I—Denial of Plan Benefits Against All Defendants

84.     The foregoing paragraphs are incorporated herein by reference as if set forth at length.

85.     The Plan is an "employee welfare benefit plan" within the meaning of the ERISA § 3(1), 29 U.S.C. § 1002(1).

86.     Pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), an ERISA plan participant may bring an action to recover benefits due under the terms of the Plan, to enforce her rights under the terms of the Plan, or to clarify her rights to future benefits under the terms of the Plan.

87.     Every medical provider who examined Ms. Michener, including four IMEs retained on behalf of Verizon's benefit plans, agreed that she was "disabled" within the meaning of the Plan.  There was no evidence that the condition for which benefits were paid for three years had improved, instead, the evidence showed that Ms. Michener's condition had worsened. Nevertheless, Defendants ignored the clinical findings of the examining providers and deferred to the conclusions of their so-called "peer reviewers," who never actually examined Ms. Michener and who reached their conclusions by a selective reading of her medical records, without explaining why they rejected the opinions and conclusions of her medical providers.

88.     It is particularly inappropriate to terminate benefits based on a paper review by a psychiatrist who has done no examination, taken no history (other than cherry picking the claimant's medical records), and yet has leaped to summary conclusions regarding the claimants' limitations.

89.     Benefits cannot be terminated based on a records review where there is no corresponding change in Ms. Michener's medical condition.

90.     Defendants violated the full and fair review provisions of ERISA 503, 29 U.S.C. § 1133, and the Department of Labor regulations thereunder, 29 C.F.R. 2560.503-1(h), in that, *inter alia*:

- they failed to provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination;

- they required Ms. Michener to apply for Social Security disability benefits, which she did, and which were awarded, substantially reducing the monthly benefit she receives under the LTD Plan, then ignoring Social Security's finding of disability, which involves a determination that she is unable to "engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A);

- they sent Ms. Michener's claim file to an unknown entity, thereby violating her privacy rights;

- they failed to consider whether Ms. Michener is disabled due to co-morbidities, even though its peer-reviewers agreed that clinically significant depressive symptoms increase progressively and independently with the severity of sleep apnea, a condition which Ms. Michener has.

91. Defendants violated the manner and content of notification of benefit determination provisions of ERISA 503, 29 U.S.C. § 1133, and the Department of Labor regulations thereunder, 29 C.F.R. 2560.503-1(g), in that, *inter alia*, the initial denial of benefits letter failed to shall set forth, in a manner calculated to be understood by the claimant, a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary and a statement concerning any rule, guideline, protocol, or other similar criterion that was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion.

### COUNT II—Claim for Statutory Violations
### Under ERISA § 502(a)(3) Against MetLife and the VEBC

92. The foregoing paragraphs are incorporated herein by reference as if set forth at length.

93. Defendants MetLife and the VEBC violated the full and fair review provisions of ERISA § 503, 29 U.S.C. § 1133.

94. As a result, Plaintiff suffered actual harm as she was denied benefits to which she was entitled.

95.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) permits a participant to bring an action to enjoin any act or practice which violates ERISA or the terms of the Plan or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the LTD Plan.

## V.  RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court:

(a) Assume jurisdiction of this cause of action;

(b) Grant judgment in her favor and against Defendant(s);

(c) Declare that Defendant(s) breached their duties under ERISA and under the Plan;

(d) Order that Defendant(s) pay all LTD benefits due under the Plan from the date of termination of benefits to the date of judgment, including interest thereon;

(e) Declare Plaintiff's rights to LTD benefits under the Plan and clarify her rights to LTD benefits in the future under the terms of the Plan, by *inter alia,* declaring that Defendant must continue to pay to Plaintiff all benefits under the Plan from the date of judgment throughout the remainder of her entitled benefit period;

(f) Declare Plaintiff's rights to continuing health benefits, and any other benefits to which she is untitled under the terms of any benefit plans;

(g) Enjoin Defendants to provide a procedure for a full and fair review of adverse determinations under the Plan in accordance with 29 U.S.C. § 1133;

(h) Order restitution or surcharge to disgorge Defendants' unjust enrichment in wrongfully delaying and denying benefits and/or to make Plaintiff whole for losses, including but not limited to harm suffered for the delay in receiving LTD and other benefits, and payment of her attorneys' fees caused by MetLife's and the VEBC's violation of 29 U.S.C. § 1133 and breach of fiduciary duty;

(i) Order that Defendant(s) pay the costs of suit, including Plaintiff's attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g); and

(j) Award all such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: February 16, 2017     /s/ Tybe Ann Brett
            Tybe A. Brett, Esquire
            PA I.D. 30064
            tbrett@fdpklaw.com

            Ruairi McDonnell, Esquire
            PA I.D. 316998
            RMcDonnell@fdpklaw.com

            FEINSTEIN DOYLE PAYNE &
            KRAVEC, LLC
            429 Fourth Avenue
            Law & Finance Building, 13th Floor
            Pittsburgh, PA 15219
            T.: (412) 281-8400
            F.: (412) 281-1007

            *Attorneys for Plaintiff*